1   **WO**

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8

9   Benjamin Delgado Najera, Jr.,          )   CIV 10-1536-PHX-FJM (MHB)
                                           )
10              Petitioner,                )   **REPORT AND RECOMMENDATION**
                                           )
11  vs.                                    )
                                           )
12  Charles L. Ryan, et al.,               )
                                           )
13              Respondents.               )
                                           )
14  _____)

15  TO THE HONORABLE FREDERICK J. MARTONE, U.S. DISTRICT JUDGE:

16          Petitioner Benjamin Delgado Najera, Jr., who is confined in the Arizona State Prison

17  Complex-Eyman, has filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.

18  § 2254 (Doc. 1).  Respondents filed an Answer (Doc. 12), and Petitioner filed a Reply (Doc.

19  15).

20                          **FACTUAL BACKGROUND**

21          From January through June, 2005, 50-year-old Laurette had "run into some hard

22  times" and was staying with her friend, Sheila, in a small trailer located in a mobile home

23  park at 2605 West Van Buren in Phoenix.  (Doc. 12, Exh. D at 50-51, 54, 99, 107; Exh. E at

24  13.)  While living with Sheila, Laurette met a neighbor, Jose, who lived in the trailer behind

25  Sheila's trailer.  (Doc. 12, Exh. D at 54.)  Through Jose, Laurette met Petitioner, who often

26  visited Jose.  (Doc. 12, Exh. D at 54.)  Laurette sometimes sat outside Jose's trailer and

27  talked with Jose and Petitioner, who according to Laurette were "always pleasant," "always

28  nice."  (Doc. 12, Exh. D at 54-55.)

1    In late June 2005, Laurette and Sheila agreed that it was time for Laurette to move out
2    because Sheila's daughter and her daughter's boyfriend were going to move into the trailer.
3    (Doc. 12, Exh. D at 53, 107.) On June 27, 2005, Laurette packed her belongings into three
4    small duffle bags and stopped by Jose's trailer to ask to borrow some money for a cab ride
5    to another friend's home where she intended to stay. (Doc. 12, Exh. D at 53, 55, 81.) At the
6    time, Petitioner was in Jose's trailer with "a beer in his hand." (Doc. 12, Exh. D at 55-56.)
7    When Laurette asked Jose if she could borrow some money for a cab, Petitioner interjected,
8    "oh, you can just stay at my house. I'm on my way home. You can go to sleep on my couch.
9    I don't mind. You'll be okay there." (Doc. 12, Exh. D at 55-56.) Laurette declined
10   Petitioner's invitation, but Petitioner stated, "I already got a cab coming. You don't have to
11   pay any money. I have food. You'll be all right." (Doc. 12, Exh. D at 56.)

12   When the cab arrived, Petitioner and Laurette got in, and they rode towards
13   Petitioner's home. (Doc. 12, Exh. D at 56.) According to Laurette, Petitioner was "jovial"
14   and "happy," "chatting away" about "some bar" he had been at prior to arriving at Jose's
15   trailer. (Doc. 12, Exh. D at 56.) Petitioner directed the cab driver down an alley, then
16   through a gate and towards a "nice house." (Doc. 12, Exh. D at 56-57.) Before reaching the
17   house, however, they stopped at a "garage" that "would fit one car maybe." (Doc. 12, Exh.
18   D at 57, 59.) Petitioner asked Laurette to "come in." (Doc. 12, Exh. D at 57.) Laurette
19   remarked, "[y]ou live in here?" (Doc. 12, Exh. D at 57.)

20   Petitioner opened the only door leading into the garage and turned on a light. (Doc.
21   12, Exh. D at 58-60, 73.) The garage had been "converted into ... a bedroom," and had only
22   one door and a small window. (Doc. 12, Exh. D at 58-59.) The one room had a refrigerator,
23   microwave, couch, "a mattress pushed up against the wall," and "lots of boxes against the
24   walls." (Doc. 12, Exh. D at 58.) In the back of the room there was "a toilet and a small
25   standing shower," but "no door." (Doc. 12, Exh. D at 58-59.) Laurette stated that the
26   interior of the room was "a mess," with beer bottles, some with cigarette butts inside,
27   scattered about the room. (Doc. 12, Exh. D at 59.) Petitioner pointed to the mattress and
28   said, "I sleep on that." (Doc. 12, Exh. D at 60.) At some point, Laurette indicated that she

1   was "[r]eally uncomfortable" because she assumed that she would be sleeping on a couch in

2   a "living room" or "den" – presumably in a separate room from Petitioner  (Doc. 12, Exh.

3   D at 60.)  She told Petitioner that she was "really tired" and "just wanted to go to sleep."

4   (Doc. 12, Exh. D at 60.)  Petitioner replied, "[t]hat's okay.  You just relax.  Turn the TV on,

5   turn the stereo on."  (Doc. 12, Exh. D at 60-61.)

6       Petitioner told Laurette that he was going to the store to buy some food, and then he

7   left carrying "small bottles of beer."  (Doc. 12, Exh. D at 61.)  Petitioner returned about an

8   hour later, but did not have any "food," just "alcohol."   (Doc. 12, Exh. D at 61, 82.)

9   Petitioner had "wine coolers," "Zima," and three "bigger bottles" of beer.  (Doc. 12, Exh. D

10   at 61.)  One of the bottles of beer was nearly empty, and Petitioner dropped the bottle and it

11   broke on the floor.  (Doc. 12, Exh. D at 61-62.)

12       Laurette was sitting on the couch watching the news and Petitioner told her to "put

13   the radio on."  (Doc. 12, Exh. D at 62.)  She, however, continued to watch the news and

14   Petitioner sat down next to her on the couch, leaned over, turned off the television, and

15   turned on the radio.  (Doc. 12, Exh. D at 62.)  According to Laurette, Petitioner proceeded

16   to sit closer to her, "put his arm around" her, and began "pulling [her] neck."  (Doc. 12, Exh.

17   D at 62.)  Laurette asked, "what are you doing?" She then stated, "I've never done anything

18   to – to make you think you know that I am interested in any way, in that way."  (Doc. 12,

19   Exh. D at 62-63.)  Petitioner then "jump[ed] up," and stated, "I'm sorry.  We're friends.  I'm

20   sorry.  I don't know what came over me.  I'm sorry."  (Doc. 12, Exh. D at 63.)

21       Petitioner then "sat back down" on the couch next to Laurette, turned the television

22   and radio back on, then began "touching" and "rubbing" Laurette's arm and leg.  (Doc. 12,

23   Exh. D at 63.)  Laurette told Petitioner, "that's not acceptable.  What part of no don't you

24   understand?  No."  (Doc. 12, Exh. D at 63.)  Petitioner then got up, again "apologized," and

25   stated, "you want  beer, you doing okay.  I'm not going to do anything.  I'm sorry."  (Doc.

26   12, Exh. D at 63.)  Petitioner said that he "broke up" with his "girlfriend," then "put his arms

27   out" and began "walking towards" Laurette, stating, "we're friends, we're friends," as

28   Laurette was "shaking [her] head."  (Doc. 12, Exh. D at 63.)  Petitioner then "threw himself

on" Laurette, who was 5 feet 4 inches and weighed only 110 pounds.  (Doc. 12, Exh. D at 63-64.)  Laurette stated that she was "scared," "angry," and "disgusted."  (Doc. 12, Exh. D at 64.)  She was able to get off the couch and began "screaming" at Petitioner.  (Doc. 12, Exh. D at 64.)  Petitioner, who was "drunk," "slipping" and "sliding around" in the remnants of the bottle of beer he had dropped and broken on the floor, then "back[ed] up" and got a "bat" from "behind something by the front door."  (Doc. 12, Exh. D at 64, 102.)  Laurette then picked up an empty beer bottle and broke it stating, "you come near me and I will cut you up."  (Doc. 12, Exh. D at 64, 108-09.)

Petitioner "started swinging" the "[m]etal" bat, telling Laurette, "get the fuck out if [you're] not going to put out."  (Doc. 12, Exh. D at 66, 128.)  Petitioner began "calling women some horrible names," stating that women "all really want it," "all need to get it," "just say no," but "just want to."  (Doc. 12, Exh. D at 66.)  Laurette jumped up on the couch and told Petitioner, "I told you I will cut you, Ben.  Don't come near me."  (Doc. 12, Exh. D at 66, 109.)

Laurette began to lose her balance, so she got down from the couch, and Petitioner "came at" her with the bat.  (Doc. 12, Exh. D at 66, 97.)  Laurette heard a "crack," was knocked unconscious, and then awoke on the floor feeling "dizzy" and "nauseous."  (Doc. 12, Exh. D at 66-67, 91, 97.)  She saw Petitioner standing in front of the partially open door looking at her.  (Doc. 12, Exh. D at 67.)  Laurette remarked, "oh, my God, what did you do," and got up and began walking towards the bathroom area of the room.  (Doc. 12, Exh. D at 67.)  Then, Laurette decided to "rush him and try to get to the door."  (Doc. 12, Exh. D at 67.)  She put her "head down," "hands out," and ran into Petitioner, knocking him down to the floor.  (Doc. 12, Exh. D at 67.)  Laurette "kept kicking" Petitioner who was "moving backwards," "slobbering on the floor," and "trying to get up."  (Doc. 12, Exh. D at 67, 102.)  Laurette was unable to get by Petitioner, so she kicked him through the open door and closed it.  (Doc. 12, Exh. D at 67, 72, 95.)  Seeing that "the woodwork around the frame of the door was broken," she propped a chair against the latch so that Petitioner could not open it.  (Doc.

1   12, Exh. D at 67, 72, 95.)  She then turned out the lights so that Petitioner could not see her

2   and sat on the couch "screaming for help."  (Doc. 12, Exh. D at 72.)

3          Laurette discovered that she was bleeding "[b]adly," and remained on the couch

4   screaming and yelling for what "seemed like hours and hours and hours."  (Doc. 12, Exh. D

5   at 73-75.)  She became "exhausted" and began "nodding off."  (Doc. 12, Exh. D at 75.)  She

6   received no response to her cries for help.  (Doc. 12, Exh. D at 75.)

7          Eventually, "the door was just busted open," and Laurette saw Petitioner "standing

8   there with the bat in his hands."  (Doc. 12, Exh. D at 75.)  Petitioner was "yelling" at Laurette

9   "about locking him out of his house" and "swung" the bat, striking Laurette on her left arm

10  and left side.  (Doc. 12, Exh. D at 75-76.)  Laurette began "screaming again" and, through

11  the open door, saw a light come on in a yard across the alley.  (Doc. 12, Exh. D at 76, 96,

12  114-15.)  Petitioner then struck her in the head with the bat.  (Doc. 12, Exh. D at 76, 96, 114-

13  15.)  Petitioner also noticed the light, and walked outside the garage with the bat and a beer.

14  (Doc. 12, Exh. D at 76, 96, 115.)  According to Laurette, she "couldn't wipe the blood

15  away," and her head, side, teeth, and mouth ached.  (Doc. 12, Exh. D at 76-77.)  She could

16  feel her eye "swelling."  (Doc. 12, Exh. D at 76-77.)

17         At about 5:00 a.m. on June 28, Phoenix Police Officers Thomas Johnson and Greg

18  Scheffer were dispatched to the area of 48th Avenue and Encanto regarding a woman

19  "screaming for help," and were directed to approach through an alley behind 2224 North 48th

20  Lane.  (Doc. 12, Exh. D at 123-24; Exh. E at 5.)  As the officers drove down the alley, they

21  saw Petitioner standing by a fence in a small yard, next to "what looked like a garage."  (Doc.

22  12, Exh. D at 124; Exh. E at 5-6.)  The officers directed Petitioner to approach their patrol

23  car, and Petitioner told them that there was a woman who "would not come out of the

24  apartment or garage."  (Doc. 12, Exh. D at 125; Exh. E at 6.)  Petitioner had a "minor

25  laceration to his wrist or forearm," and said, "she cut me."  (Doc. 12, Exh. E at 6, 16.)

26         Officer Scheffer walked towards the door to the garage and, as he reached the door,

27  Laurette opened the door, holding a broken beer bottle in her hand.  (Doc. 12, Exh. E at 6-7,

28  25.)  Laurette was "shaking" and "crying," and said that she "had been struck in the head by

[Petitioner] with a bat." (Doc. 12, Exh. E at 7.)  Officer Scheffer directed Laurette to drop the broken beer bottle, which she did.  (Doc. 12, Exh. E at 7, 29.)  He then had Laurette sit down on a chair in front of the garage.  (Doc. 12, Exh. E at 7-8.)  Laurette was "very upset, visibly shaken" and had "blood on her face, down her chest."  (Doc. 12, Exh. D at 126.)  Her eye "was almost swollen shut," and her left cheek was cut and so swollen that she had trouble speaking.  (Doc. 12, Exh. D at 126.)  She said that she had been hit "two or three time in the face with the bat."  (Doc. 12, Exh. D at 128.)  The metal bat, the size of "a little league bat," was "laying up against the fence," and had a small amount of blood visible on it.  (Doc. 12, Exh. D at 128; Exh. E at 8-9.)

Petitioner, who had initially been placed in "investigative detention," was placed under arrest and Officer Travis Morrison advised him of his Miranda rights.  (Doc. 12, Exh. E at 39, 57-58.)  Petitioner acknowledged that he understood his rights and agreed to answer questions.  (Doc. 12, Exh. E at 39.)  Petitioner said that he met Laurette "earlier in the evening" at 27th Avenue and Van Buren and that they had gone to his residence with "the intention of having sexual relations with each other."  (Doc. 12, Exh. E at 39.)  Petitioner told Officer Morrison that there was "some type of altercation between them," and, around midnight, Petitioner went outside and Laurette "locked him out of the house."  (Doc. 12, Exh. E at 39-40.)  Petitioner stated that "for approximately four hours, he waited outside the house."  (Doc. 12, Exh. E at 40.)  When asked "what he was doing outside the house," Petitioner was unable to provide an answer.  (Doc. 12, Exh. E at 40.)

Petitioner claimed that he "went back inside to get a cigarette," and, when he "opened the door," Laurette "was standing there with a glass bottle."  (Doc. 12, Exh. E at 40.)[1] Petitioner said that Laurette "lunged at him with a glass bottle," "at which time he reached behind the main entrance door where there was a metal bat, and used the bat in self defense by pushing her back."  (Doc. 12, Exh. E at 40, 49.)  Petitioner demonstrated how he used the bat by making "a motion of having the bat in both hands, and pushing her back."  (Doc. 12,

---

[1] Petitioner did not explain how he was able to open the door that had been locked for four hours.  (Doc. 12, Exh. E at 43.)

Exh. E at 42.)   However, according to Officer Morrison, Laurette's injuries were not consistent with Petitioner's claim that he "pushed" her; rather, they were consistent with having been "beaten with a baseball bat."  (Doc. 12, Exh. E at 43.)

The cut on Petitioner's arm was "[e]xtremely minor," and he initially declined medical treatment.  (Doc. 12, Exh. E at 44-45.)  While the Fire Department was on the scene treating Laurette, though, Officer Morrison suggested that Petitioner allow them to take a look at the cut and Petitioner agreed.  (Doc. 12, Exh. E at 45.)  They "wrapped a little bit of gauze around it, and released him."  (Doc. 12, Exh. E at 45.)  The officers photographed the metal bat, but did not seize it because both Petitioner and Laurette acknowledged that "the bat was involved."  (Doc. 12, Exh. E at 8-9, 41-42.)  Officer Morrison indicated that the inside of the garage was "just a couple hundred square feet" and was "a mess."  (Doc. 12, Exh. E at 44, 46.)

Phoenix Police Officer Warren Tittlemier was dispatched to Maryvale Hospital to speak to Laurette, but was unable to do so because hospital personnel were preparing to conduct an MRI.  (Doc. 12, Exh. E at 65-66.)  Laurette reported "head trauma" and "nausea."  (Doc. 12, Exh. E at 67.)  Officer Tittlemier was informed, however, that Laurette's injuries were "non life-threatening" and he left the hospital.  (Doc. 12, Exh. E at 66.)

Laurette suffered three fractures to her left cheekbone, two fractures to her left eye orbit, and a broken nose.  (Doc. 12, Exh. D at 79, 91, 106.)  Some of her teeth were "cracked," and she later lost all of her upper teeth within two months.  (Doc. 12, Exh. D at 76, 106.)

## PROCEDURAL BACKGROUND

On July 8, 2005, the State of Arizona charged Petitioner with aggravated assault, a dangerous offense.  (Doc. 12, Exh. D at 32-33.)  On November 14, 2005, Petitioner filed a motion to change counsel and represent himself.  (Doc. 12, Exh. H.)  The trial court personally addressed Petitioner, denied his motion to change counsel because it was filed on

the day of trial,[2] granted his request to represent himself, and appointed his former trial counsel as advisory counsel. (Doc. 12, Exh. B at 5-7.)

A jury ultimately convicted Petitioner as charged. (Doc. 12, Exh. F at 16.) The jurors also found beyond a reasonable doubt several aggravating circumstances, as well as historical prior felony convictions. (Doc. 12, Exh. F at 65, 73.) On March 29, 2006, the trial court imposed a super-aggravated sentence of 25 years' imprisonment to be served concurrently with a 2½-year sentence imposed in Maricopa County Case Number CR2005–048600–001 DT. (Doc. 12, Exh. G at 16.)

On appeal, Petitioner raised the following claims:

1.      Whether defendant is entitled to have the jury consider his self-defense argument without the rejected burden of proving self-defense by a preponderance of evidence, relieving the state of the burden of proving their case beyond a reasonable doubt?

2.      Whether the trial court violated Najera's Sixth Amendment right to counsel when it denied his request for new counsel without having a hearing?

3.      Whether the court failed to follow the required procedures to insure that a waiver of counsel was a knowing, voluntary and intelligent choice?

(Doc. 12, Exh. I at v.)  On May 22, 2007, the Arizona Court of Appeals issued a memorandum decision rejecting the claims raised by Petitioner and affirming his conviction and sentence. (Doc. 12, Exh. J.)  Petitioner filed a petition for review to the Arizona Supreme Court. (Doc. 12, Exh. K.)  On October 26, 2007, the supreme court denied review. (Doc. 12, Exh. L.)

On April 21, 2008, Petitioner filed a notice of post-conviction relief in Maricopa County Superior Court. (Doc. 12, Exh. M.)  Petitioner's appointed counsel filed a notice of completion, avowing that he had corresponded with Petitioner and reviewed the record, but was unable to raise any viable issues for post-conviction relief. (Doc. 12, Exh. N.)  Petitioner subsequently filed a pro per petition for post-conviction relief, raising the following claims:

---

[2]   The motion was filed with the Clerk's Office at 3:36 p.m. on the day prior to commencement of trial (Doc. 12, Exh. H), but was not received by the trial court. (Doc. 12, Exh. B at 2-3.)  Petitioner's counsel provided the trial court a copy of the motion on the first day of trial. (Doc. 12, Exh. B at 2-3.)

(1) the record does not reflect that the victim's medical records were disclosed, despite the fact that such was specifically requested pursuant to <u>Brady</u>[3] and Rule 15.1 of the Arizona Rules of Criminal Procedure; (2) the trial judge was biased and prejudiced; and (3) improper influence upon the jury. (Doc. 12, Exh. O.)

On July 8, 2008, the state court summarily denied the petition, expressly finding that all of the claims raised were "precluded" because "all of the issues raised in the current petition could have been raised on appeal." (Doc. 12, Exh. P.) On July 22, 2008, Petitioner filed a motion for rehearing in the state court. (Doc. 12, Exh. Q.) On August 25, 2008, Petitioner filed a petition for review to the Arizona Court of Appeals. (Doc. 12, Exh. R.) On October 26, 2008, the court of appeals denied review. (Doc. 12, Exh. S.) On November 20, 2009, Petitioner filed a petition for review to the Arizona Supreme Court. (Doc. 12, Exh. T.) On March 16, 2010, the supreme court denied review. (Doc. 12, Exh. U.)

Meanwhile, on December 23, 2009, Petitioner filed a letter in Maricopa County Superior Court complaining that his July 22, 2008 motion for rehearing had not been ruled on. (Doc. 12, Exh. V.) On January 12, 2010, Judge Paul McMurdie rejected Petitioner's claim that his original petition for post-conviction relief should not have been referred to the trial judge (Judge Linda Akers) because Petitioner "fail[ed] to set forth any basis for a claim of bias or prejudice other than that Judge Akers summarily rejected the petition," and referred the motion for rehearing to Judge Akers. (Doc. 12, Exh. W.) On January 26, 2010, Judge Akers denied the motion for rehearing on the ground that, by filing a petition for review to the Arizona Court of Appeals while his motion for rehearing was pending, Petitioner divested the state court of jurisdiction. (Doc. 12, Exh. X.)

On or about February 24, 2010, Petitioner filed a petition for review from the state court's order denying the motion for rehearing. (Doc. 12, Exh. Y.) On March 4, 2010, the Arizona Court of Appeals granted the State's motion to dismiss the petition for review because the court of appeals had already denied a petition for review and the denial of the

---

[3] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)

motion for rehearing was not subject to review.  (Doc. 12, Exh. Z.)  Petitioner filed a petition for review from the court of appeals' dismissal of the petition for review.  (Doc. 12, Exh. AA.)  On July 7, 2010, the supreme court denied review.  (Doc. 12, Exh. BB.)

On July 20, 2010, Petitioner filed a Petition for Writ of Habeas Corpus, raising the following claims:

> Ground One: Actual or Constructive Denial of Counsel.  The Arizona Court of Appeals Memorandum Decision, dated [May 22, 2007], 1 CA-CR 06-0318/1 CA-CR 06-0635 (consolidated) found [P]etitioner had made a knowing, voluntary and intelligent waiver of counsel, and affirmed [P]etitioner's sentence and conviction[] [f]or Aggravated Assault, using a bat to cause physical injury;
>
> Ground Two: Pretrial Ineffective Assistance of Counsel.  Under Arizona (Rule 15.1) and Federal [Brady] law, the alleged victim's medical records, to wit: Victim Impact Statement, x-rays, MRI's, CAT Scans of injuries which resulted during fight/assault are automatically discoverable, thus counsel's failure to introduce this evidence during the plea[] negotiations is IAC per se;
>
> Ground Three: Denial of Right to Impartial Judge.  Petitioner's PCR petitions in the lower court set forth a Prima Facie [Brady] violation, cause by a bias[ed] judge's unfair and unconstitutional concealment and suppression of the alleged victim's criminal and medical records in violation of mandates of due process of law, under Rule 15.1 and [Brady v. Maryland];
>
> Ground Four: Deliberate Prosecutor Misconduct.  [Brady] violation.  Petitioner was convicted having been denied pre[]trial discovery of the alleged victim's medical records, to which he was entitled under his Notice of Affirmative Defense, and under his Request for Automatic Disclosure required by Rule 15.1, and the trial court compounded the State's malfeasance by denying him that discovery in PCR (Rule 32) proceedings.

(Doc. 1 at 6-9.)  Respondents filed an Answer (Doc. 12), and Petitioner filed a Reply (Doc. 15).

## DISCUSSION

In their Answer, Respondents contend that Grounds Two through Four presented in Petitioner's habeas petition are procedurally defaulted.  Regarding the remaining claim, Respondents argue that Ground One is meritless.  Respondents request that the habeas petition be denied and dismissed with prejudice.

\\\

\\\

\\\

**A.**      **Exhaustion and Procedural Default**

A state prisoner must exhaust his remedies in state court before petitioning for a writ of habeas corpus in federal court. See 28 U.S.C. § 2254(b)(1) and (c); Duncan v. Henry, 513 U.S. 364, 365-66 (1995); McQueary v. Blodgett, 924 F.2d 829, 833 (9th Cir. 1991). To properly exhaust state remedies, a petitioner must fairly present his claims to the state's highest court in a procedurally appropriate manner. See O'Sullivan v. Boerckel, 526 U.S. 838, 839-46 (1999). In Arizona, a petitioner must fairly present his claims to the Arizona Court of Appeals by properly pursuing them through the state's direct appeal process or through appropriate post-conviction relief. See Swoopes v. Sublett, 196 F.3d 1008, 1010 (9th Cir. 1999); Roettgen v. Copeland, 33 F.3d 36, 38 (9th Cir. 1994).

Proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim he raises on habeas by describing the operative facts and federal legal theory upon which the claim is based. See, e.g., Picard v. Connor, 404 U.S. 270, 275-78 (1971) ("[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."). A claim is only "fairly presented" to the state courts when a petitioner has "alert[ed] the state courts to the fact that [he] was asserting a claim under the United States Constitution." Shumway v. Payne, 223 F.3d 982, 987 (9th Cir. 2000) (quotations omitted); see Johnson v. Zenon, 88 F.3d 828, 830 (9th Cir. 1996) ("If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court.").

A "general appeal to a constitutional guarantee," such as due process, is insufficient to achieve fair presentation. Shumway, 223 F.3d at 987 (quoting Gray v. Netherland, 518 U.S. 152, 163 (1996)); see Castillo v. McFadden, 399 F.3d 993, 1003 (9th Cir. 2005) ("Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory."). Similarly, a federal claim is not exhausted merely because its factual basis was presented to the state courts on state law grounds – a "mere similarity between a claim of state and federal error is insufficient to establish exhaustion." Shumway, 223 F.3d at 988 (quotations omitted); see Picard, 404 U.S. at 275-77.

Even when a claim's federal basis is "self-evident," or the claim would have been decided on the same considerations under state or federal law, a petitioner must still present the federal claim to the state courts explicitly, "either by citing federal law or the decisions of federal courts." <u>Lyons v. Crawford</u>, 232 F.3d 666, 668 (9th Cir. 2000) (quotations omitted), <u>amended by</u> 247 F.3d 904 (9th Cir. 2001); <u>see</u> <u>Baldwin v. Reese</u>, 541 U.S. 27, 32 (2004) (claim not fairly presented when state court "must read beyond a petition or a brief ... that does not alert it to the presence of a federal claim" to discover implicit federal claim).

Additionally, under the independent state grounds principle, a federal habeas court generally may not review a claim if the state court's denial of relief rests upon an independent and adequate state ground. <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 731-32 (1991). The United States Supreme Court has explained:

> In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

<u>Id.</u> at 730-31. A petitioner who fails to follow a state's procedural requirements for presenting a valid claim deprives the state court of an opportunity to address the claim in much the same manner as a petitioner who fails to exhaust his state remedies. Thus, in order to prevent a petitioner from subverting the exhaustion requirement by failing to follow state procedures, a claim not presented to the state courts in a procedurally correct manner is deemed procedurally defaulted, and is generally barred from habeas relief. <u>See</u> <u>id.</u> at 731-32.

Claims may be procedurally barred from federal habeas review based upon a variety of factual circumstances. If a state court expressly applied a procedural bar when a petitioner attempted to raise the claim in state court, and that state procedural bar is both

"independent"[4] and "adequate"[5] – review of the merits of the claim by a federal habeas court is barred.  See Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991) ("When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court.") (citing Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977) and Murray v. Carrier, 477 U.S. 478, 485-492 (1986)).

Moreover, if a state court applies a procedural bar, but goes on to alternatively address the merits of the federal claim, the claim is still barred from federal review.  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. ... In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.") (citations omitted); Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir. 2003) ("A state court's application of a procedural rule is not undermined where, as here, the state court simultaneously rejects the merits of the claim.") (citing Harris, 489 U.S. at 264 n.10).

Furthermore, a subsequent "silent" denial of review by a higher court simply affirms a lower court's application of a procedural bar.  See Ylst, 501 U.S. at 803 ("where ... the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits").

A procedural bar may also be applied to unexhausted claims where state procedural rules make a return to state court futile.  See Coleman, 501 U.S. at 735 n.1 (claims are barred

---

[4] A state procedural default rule is "independent" if it does not depend upon a federal constitutional ruling on the merits.  See Stewart v. Smith, 536 U.S. 856, 860 (2002).

[5] A state procedural default rule is "adequate" if it is "strictly or regularly followed." Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (quoting Hathorn v. Lovorn, 457 U.S. 255, 262-53 (1982)).

1   from habeas review when not first raised before state courts and those courts "would now

2   find the claims procedurally barred"); Franklin v. Johnson, 290 F.3d 1223, 1230-31 (9th Cir.

3   2002) ("[T]he procedural default rule barring consideration of a federal claim 'applies only

4   when a state court has been presented with the federal claim,' but declined to reach the issue

5   for procedural reasons, or 'if it is clear that the state court would hold the claim procedurally

6   barred.'") (quoting Harris, 489 U.S. at 263 n.9).

7           In Arizona, claims not previously presented to the state courts via either direct appeal

8   or collateral review are generally barred from federal review because an attempt to return to

9   state court to present them is futile unless the claims fit in a narrow category of claims for

10  which a successive petition is permitted.   See Ariz.R.Crim.P. 32.1(d)-(h) & 32.2(a)

11  (precluding claims not raised on appeal or in prior petitions for post-conviction relief, except

12  for narrow exceptions); Ariz.R.Crim.P. 32.4 (time bar).  Because Arizona's preclusion rule

13  (Rule 32.2(a)) is both "independent" and "adequate," either its specific application to a claim

14  by an Arizona court, or its operation to preclude a return to state court to exhaust a claim,

15  will procedurally bar subsequent review of the merits of that claim by a federal habeas court.

16  See Stewart, 536 U.S. at 860 (determinations made under Arizona's procedural default rule

17  are "independent" of federal law); Smith v. Stewart, 241 F.3d 1191, 1195 n.2 (9th Cir. 2001)

18  ("We have held that Arizona's procedural default rule is regularly followed ["adequate"] in

19  several cases.") (citations omitted), reversed on other grounds, Stewart v. Smith, 536 U.S.

20  856 (2002); see also Ortiz v. Stewart, 149 F.3d 923, 931-32 (rejecting argument that Arizona

21  courts have not "strictly or regularly followed" Rule 32 of Arizona Rules of Criminal

22  Procedure); State v. Mata, 916 P.2d 1035, 1050-52 (Ariz. 1996) (waiver and preclusion rules

23  strictly applied in post-conviction proceedings).

24          The federal court will not consider the merits of a procedurally defaulted claim unless

25  a petitioner can demonstrate that a miscarriage of justice would result, or establish cause for

26  his noncompliance and actual prejudice.  See Schlup v. Delo, 513 U.S. 298, 321 (1995);

27  Coleman, 501 U.S. at 750-51;  Murray, 477 U.S. at 495-96.  Pursuant to the "cause and

28  prejudice" test, a petitioner must point to some external cause that prevented him from

1  following the procedural rules of the state court and fairly presenting his claim.  "A showing

2  of cause must ordinarily turn on whether the prisoner can show that some objective factor

3  external to the defense impeded [the prisoner's] efforts to comply with the State's procedural

4  rule.  Thus, cause is an external impediment such as government interference or reasonable

5  unavailability of a claim's factual basis."  Robinson v. Ignacio, 360 F.3d 1044, 1052 (9th Cir.

6  2004) (citations and internal quotations omitted).  Ignorance of the State's procedural rules

7  or other forms of general inadvertence or lack of legal training and a petitioner's mental

8  condition do not constitute legally cognizable "cause" for a petitioner's failure to fairly

9  present his claim.  Regarding the "miscarriage of justice," the Supreme Court has made clear

10  that a fundamental miscarriage of justice exists when a Constitutional violation has resulted

11  in the conviction of one who is actually innocent.  See Murray, 477 U.S. at 495-96.

12       In Ground Two of his habeas petition, Petitioner alleges that trial counsel was

13  ineffective because he "conspired with the prosecutor to intentionally deprive his client of

14  the exculpatory and impeachment evidence ([Brady] material) contained throughout the

15  alleged victim's criminal and medical records/reports" both pretrial and at trial.  (Doc. 1 at

16  7.)  In his petition for post-conviction relief, Petitioner raised a similar but different claim:

17  that the victim's medical records were not disclosed in violation of Brady and Rule 15.1 of

18  the Arizona Rules of Criminal Procedure.  (Doc. 12, Exh. O at 5-8.)  Petitioner raised

19  substantive Brady and state law discovery claims, not a Sixth Amendment ineffective

20  assistance of counsel claim.  Thus, Petitioner's ineffective assistance claim is raised for the

21  first time on habeas review and is not exhausted because it was not fully and fairly presented

22  to state courts.  See 28 U.S.C. § 2254(b).  Failure to fairly present Ground Two has resulted

23  in procedural default because Petitioner is now barred from returning to state courts.  See

24  Ariz.R.Crim.P. 32.2(a), 32.4(a).  Additionally, Ground Two is also procedurally defaulted

25  because the state court found the claim "precluded" because it could have been, but was not,

26  raised on appeal.  (Doc. 12, Exh. P.)  The state court's express reliance on Arizona's

27  procedural rule barring post-conviction relief for claims that could have raised on direct

28

1   appeal constituted an independent and adequate ground barring review of Petitioner's claim.

2   See Harris, 489 U.S. at 261-62; Poland v. Stewart, 169 F.3d 573, 585 (9th Cir. 1999).

3       In Ground Three, Petitioner alleges that he was denied the right to a fair and impartial

4   judge.  (Doc. 1 at 8.)  Petitioner raised this claim in his petition for post-conviction relief.

5   (Doc. 12, Exh. O at 8-12.)  Ground Three is procedurally defaulted because the state court

6   found the claim "precluded" because it could have been, but was not, raised on direct appeal.

7   (Doc. 12, Exh. P.)  The state court's reliance on Arizona's procedural rule barring post-

8   conviction relief for claims that could have raised on direct appeal constituted an independent

9   and adequate ground barring review of Petitioner's claim.  See Harris, 489 U.S. at 261-62;

10  Poland, 169 F.3d at 585.

11      In Ground Four of his Petition, Petitioner alleges that the prosecutor deliberately

12  engaged in misconduct by committing a Brady and state discovery violation regarding the

13  victim's medical records.  (Doc. 1 at 9.)  Petitioner presented this claim in his petition for

14  post-conviction relief.  (Doc. 12, Exh. O at 5-8.)  Ground Four is procedurally defaulted

15  because the state court again found the claim precluded because it could have been, but was

16  not, raised on direct appeal.  (Doc. 12, Exh. P.)  The state court's reliance on Arizona's

17  procedural rule barring post-conviction relief for claims that could have raised on direct

18  appeal constituted an independent and adequate ground barring review of Petitioner's claim.

19  See Harris, 489 U.S. at 261-62; Poland, 169 F.3d at 585.

20      To the extent discernible, in his Reply to Respondents' Answer, Petitioner appears to

21  argue that the "fundamental miscarriage of justice" exception excuses the procedural defaults

22  of Grounds Two through Four.  (Doc. 15.)  Specifically, he contends that the "state

23  authorities committed a 'fundamentally unfair act' in not disclosing Laurette's medical

24  records, the suppression of this exculpatory evidence, [Petitioner] claims proves his 'actual

25  innocence' pursuant to his justification defense ... ."  Petitioner has not met his burden of

26  demonstrating the requisite "actual innocence."

27      A petitioner's claim of actual innocence must be supported "with new reliable

28  evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts,

1    or critical physical evidence – that was not presented at trial." Schlup, 513 U.S. at 324. The

2    petitioner "must show that, in light of all the evidence, including evidence not introduced at

3    trial, 'it is more likely than not that no reasonable juror would have found petitioner guilty

4    beyond a reasonable doubt.'" Majoy v. Roe, 296 F.3d 770, 776 (9th Cir. 2002) (quoting

5    Schlup, 513 U.S. at 327). See also Griffin v. Johnson, 350 F.3d 956, 962-63 (9th Cir. 2003).

6            Here, Petitioner has not offered any new evidence to support his challenge to his

7    conviction.  Rather, he merely argues that Laurette gave false testimony and speculates that

8    additional evidence in the form of Laurette's medical records could have demonstrated that

9    her injuries were not as severe as she testified a trial.  Petitioner's conclusory arguments and

10   pure speculation, however, simply do not satisfy the Schlup standard. See, e.g., Martinez v.

11   Clark, 2009 WL 1788402 at *5 (C.D. Cal. June 23, 2009) (in the few cases habeas petitioners

12   have been able to meet the Schlup standard, the "new evidence" consisted of "credible

13   evidence that the petitioner had a solid alibi for the time of the crime, numerous exonerating

14   eyewitness accounts of the crime, DNA evidence excluding the petitioner and identifying

15   another potential perpetrator, a credible confession by a likely suspect explaining that he had

16   framed the petitioner, and/or evidence contradicting the very premise of the prosecutor's case

17   against the petitioner.")

18           Accordingly, Grounds Two through Four set forth in Petitioner's habeas petition are

19   procedurally defaulted, and Petitioner has not established cause for his failure to raise his

20   claims in state court, actual prejudice, or demonstrated that a miscarriage of justice would

21   result if these issues are not addressed.  Thus, the Court will recommend that claims Two

22   through Four be denied and dismissed with prejudice.

23   **B.    Merits**

24           Pursuant to the AEDPA[6] , a federal court "shall not" grant habeas relief with respect

25   to "any claim that was adjudicated on the merits in State court proceedings" unless the state

26   court decision was (1) contrary to, or an unreasonable application of, clearly established

27

28
        [6]  Antiterrorism and Effective Death Penalty Act of 1996.

federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and delivering the opinion of the Court as to the AEDPA standard of review).  "When applying these standards, the federal court should review the 'last reasoned decision' by a state court ... ."  Robinson, 360 F.3d at 1055.

A state court's decision is "contrary to" clearly established precedent if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 404-05.  "A state court's decision can involve an 'unreasonable application' of Federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable."  Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002).

In Ground One of his Petition, Petitioner asserts that he was denied the right to counsel because he did not knowingly, voluntarily, and intelligently waive his right to counsel.

Under the Sixth Amendment, a person facing criminal charges and the risk of incarceration is guaranteed the right to assistance of counsel at every critical stage of the proceeding.  See Gideon v. Wainwright, 372 U.S. 335 (1963).  The right to counsel is fundamental and does not depend on a request by the defendant.  See Carnley v. Cochran, 369 U.S. 506, 513 (1962).

A person accused of a crime may choose to forego representation by waiving the right to counsel.  See Faretta v. California, 422 U.S. 806 (1975).  "Waiver of the right to counsel, as of constitutional rights in the criminal process generally, must be a 'knowing, intelligent ac[t] done with sufficient awareness of the relevant circumstances.'"  Iowa v. Tovar, 541 U.S. 77, 80 (2004) (quoting Brady v. United States, 397 U.S. 742, 748 (1970)).  A waiver of

1  counsel is considered knowing and intelligent when the defendant is made aware of the

2  dangers and disadvantages of self-representation, such that the record establishes that he

3  "knows what he is doing and his choice is made with eyes open." Id. at 88 (quoting Faretta,

4  422 U.S. at 835).

5      "Neither the Constitution nor Faretta compels the [trial] court to engage in specific

6  colloquy with the defendant." Lopez v.. Thompson, 202 F.3d 1110, 1117 (9th Cir.), cert.

7  denied, 531 U.S. 883 (2000).  Indeed, the Supreme Court noted "[w]e have not ... prescribed

8  any formula or script to be read to a defendant who states that he elects to proceed without

9  counsel." Tovar, 541 U.S. at 88.  Instead, "[t]he information a defendant must possess in

10  order to make an intelligent election ... will depend on a range of case-specific factors,

11  including the defendant's education or sophistication, the complex or easily grasped nature

12  of the charge, and the stage of the proceeding." Id. (citing Johnson v. Zerbst, 304 U.S. 458,

13  464 (1938)).  "[I]n a collateral attack on an uncounseled conviction, it is the defendant's

14  burden to prove that he did not competently and intelligently waive his right to the assistance

15  of counsel." Tovar, 541 U.S. at 92.

16      After the trial court denied Petitioner's motion for change of counsel, Petitioner made

17  an unequivocal request to represent himself stating, "I ask to represent myself."  (Doc. 12,

18  Exh. B at 5.)    The trial court then informed Petitioner of the disadvantages of self-

19  representation:

20      With respect to your request for pro per status, you can represent yourself if
       that's what you want to do.  I have to admonish you you will be held to the
21      same standards as any lawyer who has gone through three years of school, has
       received substantial training by virtue of practice. The issues are serious. And
22      being represented by counsel, I would think, would be appropriate.  But if you
       want to represent yourself and run the risk that there is going to be some issue
23      you don't know how to address – I will not give any help on that, I can't.  I am
       neutral, so I don't give the State or defense any help as far as filing motions,
24      when they are due and so forth.

25  (Doc. 12, Exh. B at 6.)  Having advised Petitioner of these disadvantages, the trial court

26  asked Petitioner if he was "prepared to go forward" representing himself and Petitioner

27  answered, "[y]ep."  (Doc. 12, Exh. B at 6.)  Then, the trial court granted Petitioner's request,

28  but appointed Petitioner's counsel as advisory counsel.  (Doc. 12, Exh. B at 6.)

1    On direct appeal, applying the standards set forth in <u>Faretta</u> and <u>Tovar</u>, the Arizona

2    Court of Appeals found that Petitioner made a knowing, voluntary, and intelligent waiver of

3    counsel.  Having reviewed the record, the Court finds that the state court's decision was

4    neither contrary to, nor an unreasonable application of, clearly established federal law.

5    The above colloquy sufficiently apprised Petitioner of the dangers and disadvantages

6    of self-representation, specifically explaining that Petitioner would not have the legal training

7    necessary to adequately address the issues at trial; that the judge would not be permitted to

8    assist him; that the issues were serious; and that it would be appropriate to proceed with

9    counsel.  Further, as the appellate court noted, the record demonstrates that Petitioner had

10   extensive experience with the criminal justice system (having 11 prior felony convictions –

11   Doc. 12, Exh. G at 15-16), and had actively participated in his settlement conference (Doc.

12   12, Exh. A).  Indeed, less than a week before Petitioner requested to represent himself, he

13   appeared at a settlement conference wherein he exhibited a proficient knowledge of the

14   criminal justice system as well as the specifics of the case. (Doc. 12, Exh. A at 1-22.) When

15   the Commissioner began explaining the non-dangerous and dangerous sentencing charts to

16   Petitioner, he stated, "I'm familiar with it, Your Honor." (Doc. 12, Exh. A at 2-3.) When

17   the Commissioner began explaining the range of sentence Petitioner faced if he accepted the

18   State's plea offer, Petitioner interjected, "[y]eah, I'm going to get the presumptive.  I'm

19   pretty realistic it's going to be at least 10 years." (Doc. 12, Exh. A at 3-4.)  When the

20   Commissioner explained the range of sentence Petitioner faced if convicted as charged,

21   including sentence enhancement of a dangerous offense with non-dangerous historical prior

22   felony convictions, Petitioner exhibited a working knowledge of Arizona's sentencing

23   scheme:

24       THE COURT: ... Now here's the catch.  The catch is if you are convicted of
         this, Class 3 Dangerous Offense, you could end up with a conviction on your
25       record that says Class 3 Dangerous. But the State has also alleged in that case
         that you have six prior felony convictions under the non-dangerous chart.
26       They can ask that you be sentenced under the non-dangerous range, and be
         sentenced to between 7 ½ and 25 years with 11 ¼ being the presumptive. So
27       the State really can have their cake and eat it too.  And the law allows that.

28

THE DEFENDANT: It's like that all the time.  That's why we get screwed in these Plea Agreements all the time.

(Doc. 12, Exh. A at 4.)

Petitioner agreed that the State had offered him "a fair deal," explaining, "if I was guilty, Your Honor, I'd jump on it.  I told my attorney a long time ago.  I believe that's a very fair deal if I was guilty."  (Doc. 12, Exh. A at 5.)  Petitioner also made it clear that he was relying upon his experience in the criminal justice system in deciding to reject the State's offer and go to trial stating:

> THE COURT: … Let me tell you something.  Based on what I've heard so far, and my experience, let me tell you something, sir.  I've been doing this a long time.
>
> THE DEFENDANT: Me, too, Your Honor.
>
> THE COURT: And I've seen a lot of cases.
>
> THE DEFENDANT: Me too.
>
> THE COURT: I understand.  But I don't think you have much of a chance of winning.  Now you may.  And you have every right to have a trial.  I'm not trying to talk you out of that.  That's entirely your right.  I'm telling you the risk that you are running by taking this to trial in terms of the amount of time you could get, versus what the offer is, is extraordinarily different.
>
> THE DEFENDANT: I agree, Your Honor.  But like I say, you can hang me with (indiscernible).  I don't care.  I'm going down.

(Doc. 12, Exh. A at 10.)

In response to his attorney's statements that they were relying upon an "affirmative defense" and that the jurors might well determine that Petitioner "used too much force" and "had the opportunity to leave," Petitioner evidenced his familiarity with the defense and his belief that he could defend himself:

> I've already argued all this in my head.  I already know how to argue it.  Like I say, I can do it without him.  I'm familiar with the self-defense justification law.  And I've been studying up on it.  Like I said, everything he said is correct.  I agree with you.

(Doc. 12, Exh. A at 11-12.)

Based on the foregoing, and the fact that this case was not overly complex in that it involved one count of aggravated assault, limited physical violence, the victim's version of

1   the events, and Petitioner's version of the events, the Court finds that Defendant's decision

2   to represent himself was "made with eyes open." Tovar, 541 U.S. at 88 (quoting Faretta, 422

3   U.S. at 835).  The Court will recommend that Petitioner's claim asserted in Ground One be

4   denied.

5                                          **CONCLUSION**

6           Having determined that Grounds Two through Four set forth in Petitioner's habeas

7   petition are procedurally defaulted, and that Ground One fails on the merits, the Court will

8   recommend that Petitioner's Petition for Writ of Habeas Corpus be denied and dismissed

9   with prejudice.

10          **IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of

11  Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH**

12  **PREJUDICE**;

13          **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave

14  to proceed *in forma pauperis* on appeal be **DENIED** because Petitioner has not made a

15  substantial showing of the denial of a constitutional right and the dismissal of the Petition is

16  justified by a plain procedural bar and jurists of reason would not find the procedural ruling

17  debatable.

18          This recommendation is not an order that is immediately appealable to the Ninth

19  Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

20  Appellate Procedure, should not be filed until entry of the district court's judgment.  The

21  parties shall have fourteen days from the date of service of a copy of this recommendation

22  within which to file specific written objections with the Court.  See 28 U.S.C. § 636(b)(1);

23  Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure.  Thereafter, the parties have fourteen

24  days within which to file a response to the objections.  Failure timely to file objections to the

25  Magistrate Judge's Report and Recommendation may result in the acceptance of the Report

26  and Recommendation by the district court without further review.  See United States v.

27  Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file objections to any

28  factual determinations of the Magistrate Judge will be considered a waiver of a party's right

1  to appellate review of the findings of fact in an order or judgment entered pursuant to the

2  Magistrate Judge's recommendation.  <u>See</u> Rule 72, Federal Rules of Civil Procedure.

3       DATED this 27th day of April, 2011.

4

5  _____

6              Michelle H. Burns
            United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28